# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# NORTHERN DIVISION

CYNTHIA A. PARKER                                                      PLAINTIFF


v.                              NO. 1:15-cv-00130 PSH


CAROLYN W. COLVIN, Acting Commissioner                                 DEFENDANT
of the Social Security Administration


## MEMORANDUM OPINION AND ORDER


Plaintiff Cynthia A. Parker ("Parker") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Parker maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole.[1] It is Parker's position that her residual functional capacity was not properly assessed. Parker maintains that it was "[the ALJ's] own interpretation of the medical evidence and not the input of any treating or examining physician which shaped [the ALJ's] determination of [Parker's] residual functional capacity." See Document 15 at CM/ECF 9.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of making the assessment, the ALJ is required to evaluate the claimant's credibility regarding her subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ makes that evaluation by considering the medical evidence and evidence of the claimant's "daily activities; duration, frequency, and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." See Id. at 1218 [citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)].

A summary of the medical evidence relevant to Parker's residual functional capacity reflects that she is five feet, two inches tall and has weighed between 170 and 192 pounds. See Transcript at 30, 438, 441. Her Body Mass Index is therefore between 31.1 and 35.1, placing her in the obese weight range. See Transcript at 16.

Parker has experienced migraine headaches since well before the alleged onset date of February 21, 2009. See Transcript at 286-290 (01/29/2008), 280-284 (03/03/2008), 274-278 (05/10/2008), 268-272 (06/16/2008), 263-266 (08/19/2008), 258-261 (11/01/2008). After the alleged onset date, the medical evidence substantiating the severity of her headaches is minimal. Although she experienced headaches, it appears that she only sought medical attention for her more severe headaches. See Transcript at

217-221 (01/19/2010), 211-215 (12/10/2010). The progress notes from the examinations reflect that the headaches typically developed gradually without an obvious cause or trigger. She complained of nausea and vomiting, but one of the notes contained the following observation: "[u]pset stomach seems related to pain medication …" See Transcript at 212. On both occasions, she was prescribed strong medications, medications that included Demerol and Fioricet.

The lion's share of the medical evidence deals with Parker's back pain. The impairment had its origin, in large part, in an incident that occurred in February of 2009. She was working at a nursing home or medical facility as a licensed practical nurse when she was attacked by a resident. See Transcript at 33, 39, 241, 250, 329, 420, 441. During the course of the attack, Parker was thrown over a table and chair, injuring her back.

Parker sought medical attention two days after the attack when she presented to a hospital emergency room complaining of pain in her neck and back. See Transcript at 244-256, 420. She reported that the pain developed gradually and was exacerbated by movement. A physical examination revealed that she had no difficulty walking, and X-rays of her spine were normal. It was believed that her pain was "most likely caused by a strain of the muscles or ligaments that support the spine." See Transcript at 252. Parker was prescribed medication and instructed to limit her lifting and bending. Physical therapy was also recommended. She subsequently received what appears to have been three physical therapy treatments, although the record indicates that she either cancelled or missed four other treatments. See Transcript at 238-242, 420.

The medical evidence from the years following the attack reflect that Parker sought medical attention for her back pain on numerous occasions. In November of 2009, she presented to a hospital emergency room complaining of low back pain. See Transcript at 223-227. She reported difficulty walking and noted that her pain was exacerbated by movement. A physical examination revealed the following: "Patient walks without difficulty. The patient's baseline ambulation status is normal. No local bony tenderness. No paravertebral spasm. No definite trigger point. Adequate [range of motion]. No significant deformity of lower back." See Transcript at 225. She was diagnosed with lumbosacral pain and given medication that included Tylenol, Ibuprofen, and Flexeril.

In January of 2010, Parker presented to a hospital emergency room complaining of back pain. See Transcript at 217-221. A physical examination revealed, inter alia, an adequate range of motion, normal ambulation, and normal strength and tone in her extremities. There was no evidence of a "definite trigger point." See Transcript at 219. The attending physician described the examination as "completely normal." See Transcript at 219. Parker was prescribed Flexeril and told to rest.

In January of 2010, Parker saw Dr. Carl Otten, M.D., ("Otten") for complaints of back pain. See Transcript at 420. Parker reported that the pain was exacerbated by prolonged standing, sitting, and lying down but was relieved by walking. A physical examination revealed a frequent need to change positions and a decreased range of motion in the lumbar portion of her spine. Parker was diagnosed with, inter alia, contusions of the lumbar and thoracic portions of her spine. Otten prescribed Flexeril and

recommended home exercise. Otten released Parker to work with the following limitations: "limit working to 4-6 hours a day, change positions every 15 minutes, limit bending, stooping, kneeling, crouching, no lifting greater than 20 pounds occasional, 10 pounds frequent." See Transcript at 420.

Parker continued seeing Otten for complaints of back pain on what appears to have been at least eight subsequent occasions. See Transcript at 426-427 (03/03/2010), 428 (04/09/2010), 429-430 (06/09/2010), 433-434 (07/09/2010), 419 (12/03/2010), 421-422 (12/15/2010), 297-298 (01/03/2011), 295-296 (02/28/2011). The progress notes from the examinations reflect that her pain was aggravated by prolonged sitting, car travel, standing, and walking. She typically had full range of motion, but a decreased range of motion was observed in the lumbar portion of her spine. Otten continued to prescribe medication and recommended a home exercise program. In February of 2011, Otten imposed the following work restrictions on Parker: "limit standing and walking to 4 hours a day; limit bending, stooping, kneeling, crouching, do not take pain medication while driving; no lifting greater than 30 pounds occasionally." See Transcript at 295-296.

On July 7, 2010, MRI testing was performed on the lumbar portion of Parker's spine. See Transcript at 431-432. The testing revealed a "small central [disc] protrusion" at L5-S1 with "no evidence of nerve root compression or stenosis." See Transcript at 431-432. The testing also revealed a "small annular tear … at L4-L5 centrally." See Transcript at 432.

In December of 2010, Parker began seeing Dr. John Adesioye, M.D., ("Adesioye")

for complaints of back pain. See Transcript at 416-417. Parker described the pain as numbness, tingling, and burning in her right hip, right buttocks, and upper thigh. She reported that the pain was aggravated by twisting, lifting, standing, sitting, and lying down. Although she had a steady gait, she had a reduced range of motion and significant tenderness in the lumbar portion of her spine. Adesioye diagnosed "[s]ubstantial aggravation of lumbar facet and arthropathy," a lumbar protruding disc, and a lumbar sprain. See Transcript at 417. He recommended median nerve branch blocks, which began later that same month. See Transcript at 203-210.

In February of 2011, Parker began seeing the medical professionals at Burton Creek Rural Clinic for complaints of low back pain. See Transcript at 369 (02/10/2011), 367-368 (02/11/2011), 365-366 (09/22/2011), 363-364 (02/08/2012), 361-362 (04/04/2012). The progress notes from the examinations reflect that Parker's pain was aggravated by prolonged sitting, standing, and lying down. Physical examinations typically revealed a reduced range of motion in the lumbar portion of her spine. Physical therapy was recommended, which Parker subsequently received. See Transcript at 304.

In June of 2011, Parker was seen by Dr. James Fleming, Jr., M.D., ("Fleming") for a consultation at Otten's request. See Transcript at 438-439. Fleming recorded Parker's history and noted that her past treatments included "anti-inflammatory medications, epidural steroid injections, and therapy, none of which have provided long-lasting relief." See Transcript at 438. A physical examination revealed, in part, the following:

… The patient is in good general physical health and condition. Gait is

normal and the patient can heel-and-toe walk without difficulty. There is no list. The patient has no problem with balance or station. Romberg is negative. Cervical ranges of motion are full and painless in all planes. Lumbar ranges of motion are full and painless in all planes. Forward flexion and extension gives no significant pain. There is no tenderness to palpation over the thoracic, cervical, or lumbosacral spine. …

See Transcript at 438-439. Fleming diagnosed "[e]arly mild degenerative [disc] disease" and recommended physical therapy and a "low back program." See Transcript at 439. He additionally observed the following: "… due to paucity of abnormal findings, [Parker] does not require surgical intervention." See Transcript at 439.

In October of 2011, Parker began seeing Dr. Barry Feinberg, M.D., ("Feinberg") for complaints of low back pain and left lower extremity pain. See Transcript at 329-332. A physical examination revealed that Parker had a reduced range of motion in her back and legs. Feinberg diagnosed lumbar radiculopathy, lumbar spondylosis, low back pain, and sacroiliitis. He scheduled MRI testing, which was performed two days later. See Transcript at 333-348. The test results revealed some slight disc bulging at L4-L5 and a disc protrusion with "mild ligament hypertrophy and facet spurring" at L5-S1. See Transcript at 348. The diagnosis was as follows: "[m]oderate spondylotic changes of the lumbar spine, but no evidence of nerve root or cord entrapment." See Transcript at 348.

Parker continued seeing Feinberg for complaints of back pain on what appears to have been at least three subsequent occasions. See Transcript at 327-328 (01/09/2012), 325-326 (01/16/2012), 324 (01/30/2012). Parker was given pain injections on those occasions and continued to show a reduced range of motion. She also reported increased

headaches brought on by activity. Feinberg noted that Parker had stopped physical therapy but was doing a home exercise program.

Beginning in March of 2013 and continuing through July of that year, Parker saw Dr. James Hawk, M.D., ("Hawk") for complaints of low back pain. See Transcript at 441-443 (03/11/2013), 445-446 (04/10/2013), 448-449 (05/10/2013), 451-452 (06/05/2013), 454-455 (07/05/2013). The progress notes from the examinations reflect that Parker's pain varied with activity. Parker reported that her pain persisted most of the day, and she got little relief from her medication. Hawk diagnosed low back pain, muscle spasms, obesity, chronic pain syndrome, and an unspecified joint disorder of multiple sites.

On April 15, 2013, Dr. Charles Ash, M.D., ("Ash") performed a consultative physical examination of Parker. See Transcript at 412-413. He recorded her representation that she has had "lumbosacral pain radiating into the right hip and occasionally into the left hip since 2009." See Transcript at 412. He observed that she was a "moderately obese woman who stands erect and moves about satisfactorily without limp or list" and is able to walk on "toes and heels satisfactorily." See Transcript at 412. A physical examination revealed a normal range of motion in the cervical portion of her spine but a reduced range of motion and some tenderness in her lumbosacral region. Ash diagnosed probable degenerative arthritis lumbar spine and opined that Parker can "stand and walk six hours in a workday," "sit eight hours in a workday," and "lift [ten] pounds occasionally and no weight frequently." See Transcript at 413.

A summary of the non-medical evidence relevant to Parker's residual functional

capacity reflects that she was born on May 10, 1965. See Transcript at 184. She was forty-eight years old on the day of the May 9, 2014, administrative hearing.

Parker completed a series of documents in connection with her claim for disability insurance benefits. See Transcript at 145-161. In the documents, she represented that she is capable of preparing meals, attending to her personal care, performing some household chores, and shopping, but her activities vary each day because the severity of her pain fluctuates. She reported difficulty lifting, squatting, bending, standing, reaching, walking, and climbing stairs. She represented that she can lift less than ten pounds, can stand for only thirty minutes at a time, and can walk for only thirty minutes before requiring rest.

The record contains a summary of Parker's FICA earnings. See Transcript at 144. The summary reflects that her employment was sporadic. She had annual earnings in excess of twenty thousand dollars for the years 2002 and 2003, but her earnings declined dramatically in subsequent years.

Parker testified during the administrative hearing. See Transcript at 27-56. She lives in a home with her fiancé and his two children. She has a driver's license and can drive an automobile. Her fiancé's daughter sings publicly, and Parker has traveled to fairs, festivals, bars, and nursing homes to watch the performances. Parker cooks, washes dishes, attends to household chores, and shops for groceries. She also helps care for her fiancé, who is disabled, and his two children. Her hobbies include reading and deer hunting. She can walk for about thirty minutes before requiring rest, can stand for about

ten minutes before having to change positions, and can sit for approximately ten minutes

before having to move around. She can lift "like a laundry basket of clothes or a gallon

milk" on some days, see Transcript at 53; other days, she can lift nothing. On her bad

days, she is confined to a recliner. She estimated that her bad days occur approximately

four to eight days a month.

The ALJ found at step two of the sequential evaluation process that Parker has

severe impairments in the form of obesity, degenerative disc disease, and migraine

headaches. The ALJ assessed Parker's residual functional capacity and found that she is

capable of performing light work with the following additional limitations:

> … [Parker] must have [a] sit/stand option with the ability to change
> positions frequently defined as not more often than every hour for about
> two minutes. She can return to the same position or another position. She
> can occasionally climb stairs and ramps. She can occasionally stoop, kneel,
> crouch, and crawl. She can never climb ladders or scaffolds. She is limited
> to frequent pushing and pulling with both arms and legs and reaching in all
> directions. She can never lift overhead. She must avoid concentrated
> extreme cold, noises, and vibrations.

See Transcript at 14. In making the assessment, the ALJ found the following with respect

to Otten's opinions:

> … [Otten] opined that the claimant should limit standing and walking to 4
> hours a day, limit bending, stooping, kneeling, crouching, and limit lifting
> to no more than 30 pounds occasionally. … While the record supports much
> of [that] assessment, it also shows that the claimant should not lift more
> than 20 pounds at one time and is limited to light exertional work.

See Transcript at 17. The ALJ also considered Ash's opinions and found the following with

respect to his opinions:

> [The ALJ] gives little weight to the opinion of … [Ash] … He opined that the claimant can lift ten pounds occasionally but there is no amount of weight that she can lift frequently … This opinion is inconsistent with his examination of the claimant, which found normal range of motion in the claimant's upper extremities and no weakness, deformity, or atrophy. [Ash] also only found a reduced range of motion in [the claimant's] lumbar spine upon flexion (55 degrees to the normal 90 degrees) and upon extension (20 degrees to the normal 30 degrees). His weight restriction is inconsistent with his clinical findings and the record as a whole.

See Transcript at 17. The ALJ also evaluated Parker's subjective complaints. The ALJ found that they were not fully credible, in part, because her activities were greater than what would be expected of someone with the severity of symptoms claimed by Parker. The ALJ found at step four that Parker is unable to perform her past work but found at step five that there is other work she can perform. The ALJ concluded that Parker was not disabled within the meaning of the Social Security Act.

The ALJ could and did find that Parker has physical limitations, limitations caused primarily by her back pain. The question for the ALJ was the extent to which Parker's limitations impact her residual functional capacity. The evidence is conflicting on that question and is capable of more than one acceptable characterization. Substantial evidence on the record as a whole supports the ALJ's characterization of the evidence and the assessment made of Parker's residual functional capacity. The Court so finds for several reasons.

First, the ALJ adequately considered the medical evidence relevant to Parker's

obesity. The question for the ALJ was not whether Parker is obese but rather the extent to which her weight impacts her other impairments and her ability to perform work-related activities. The evidence on those questions is minimal. Her general physical health was typically characterized as "good" or "normal," <u>see</u> Transcript at 218, 438, 441, 445, 448, 451, 454, and she was encouraged on at least two occasions to exercise and diet, <u>see</u> Transcript at 442, 449. She is ambulatory and is capable of performing numerous daily activities. To the extent her daily activities are restricted, they are restricted because of her back pain and not her obesity.

Second, the ALJ adequately considered the medical evidence relevant to Parker's migraine headaches. There is little medical evidence to substantiate the severity of her headaches. At most, the medical evidence indicates that she occasionally experiences headaches of moderate severity but rarely seeks medical attention for them. It is true that she has been prescribed strong medication for her headaches, but she generally takes only over-the-counter medication to help alleviate her symptoms. To the extent her daily activites are restricted, they are restricted because of her back pain and not her headaches. Notwithstanding the scarcity of evidence substantiating the severity of Parker's headaches, it appears that the ALJ nevertheless incorporated a limitation for headaches into the assessment of Parker's residual functional capacity. Specifically, the ALJ found that Parker could perform light work but should avoid concentrated extreme cold, noises, and vibrations.

Third, the ALJ adequately considered the medical evidence relevant to Parker's

back pain. MRI testing revealed that Parker has pain at L4-L5 caused by either a slight bulging disc or a small annular tear. She also has pain at L5-S1 caused by a small disc protrusion with no evidence of nerve root compression or stenosis. Notwithstanding Fleming's observation that there is a "paucity of abnormal findings," the ALJ could and did find medical evidence to substantiate Parker's back pain. The question for the ALJ was not whether Parker experiences back pain but rather the extent to which her back pain impacts her other impairments and her ability to perform work-related activities. On that question, the ALJ could and did find that Parker was repeatedly observed to have a normal gait, normal muscle strength and tone in her extremities, and no difficulty walking. Physical examinations repeatedly revealed full range of motion, although she typically exhibited a reduced range of motion in the lumbar portion of her spine. Her treatments included anti-inflammatory medications, steroid injections, and therapy, none of which appeared to provide any long-last relief, but surgical intervention was never recommended.

The physicians who saw Parker after the February of 2009 workplace incident offered differing opinions as to the limitations caused by her back pain. For instance, Otten opined in February of 2011 that Parker should limit standing and walking to four hours a day but could lift up to thirty pounds occasionally. Ash opined, though, that Parker could stand and walk six hours in a workday, could sit eight hours in a workday, but could only lift ten pounds occasionally and no weight frequently.

Parker maintains that the ALJ erred in evaluating the medical evidence. The Court

cannot agree. Although the medical evidence was conflicting, it is the ALJ's role to resolve conflicts among the various opinions. See Bentley v. Shalala, 52 F.3d 784 (8th Cir. 1995). The ALJ may reject the conclusion of any medical expert if "inconsistent with the medical record as a whole." See Bentley v. Shalala, 52 F.2d at 787. The manner in which an ALJ resolved a conflict will be disturbed only if it falls outside the "available zone of choice." See Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006) [internal quotation omitted]. A decision is not outside the "available zone of choice" simply because the court may have reached a different conclusion had it been the finder of fact. See Id.

In this instance, the Court cannot say that the manner in which the ALJ resolved the conflicts among the various medical opinions was outside the "available zone of choice." Although Otten and Ash offered conflicting opinions, the assessment of a claimant's residual functional capacity need not mirror the findings of any one physician. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ could and did embrace portions of Otten and Ash's opinions and could and did discount other portions of their opinions because the opinions were inconsistent with their clinical findings and the record as a whole. The ALJ could and did properly find that Parker is capable of performing light work with limitations including a sit/stand option with the ability to change positions frequently, i.e., not more often than every hour for about two minutes; could return to the same position or another position; could occasionally climb stairs and ramps; and could occasionally stoop, kneel, crouch, and crawl.

Fourth, the ALJ adequately considered the non-medical evidence relevant to all

of Parker's impairments. Parker cooks, washes dishes, attends to household chores, and shops for groceries. She travels to watch her fiancé's daughter sing publicly. Parker helps care for her disabled fiancé and his two children. Her hobbies include reading and deer hunting, and her work history is not particularly impressive. Although she has taken strong medication for her migraine headaches, the medication she routinely takes for her headaches and back pain is over-the-counter medication.

"The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard." See Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). In this instance, Parker has not offered a sound reason for deviating from that rule. The characterization of her subjective complaints made by the ALJ was adequate and is one of the acceptable characterizations permitted by the evidence. The Court is not persuaded that Parker's subjective complaints were erroneously evaluated.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Parker's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 13th day of October, 2016.

_____
UNITED STATES MAGISTRATE JUDGE